In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-17-00305-CR**
_____

**ORLANDO GARCIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 15-22133**

**OPINION**

A Jefferson County grand jury indicted Orlando Garcia for the offense of

murder. The indictment alleged that Garcia intentionally and knowingly caused the

death of Rhydan Bolton by shooting him with a firearm on or about December 7,

2009.[1] *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 2019).[2] The State also alleged an enhancement, as Garcia had a prior felony conviction for possession of a prohibited weapon. A jury convicted Garcia for the offense of murder. *See id.* Garcia pled "true" to the enhancement paragraph during punishment. The jury assessed punishment, and the trial judge sentenced Garcia to seventy years' confinement in the Institutional Division of the Texas Department of Corrections. Garcia appeals his conviction and presents eight issues for our review.

In issues one through four, Garcia challenges the sufficiency of the evidence and asserts the evidence was not legally sufficient to sustain the conviction because: (1) the evidence was insufficient to prove Garcia caused the death of the complainant; (2) the evidence was insufficient to prove the alleged offense was committed intentionally; (3) the evidence was insufficient to prove the alleged offense was committed knowingly; and (4) the trial court erred in denying Garcia's motion for instructed verdict of not guilty for insufficient evidence. In issues five through seven, Garcia complains the trial court abused its discretion by allowing the State to present hearsay statements allegedly made by Kristopher Garcia through

---

[1] Appellant is also known as Orlando Escuadra-Garcia and Orlando Escuadra Garcia.

[2] We cite the current version of the applicable Penal Code provisions, as any amendments made to the cited statutes do not affect this appeal.

witnesses, (5) Natalie Castillo, (6) Kristina Sanchez, and (7) Diego Torres, respectively. Finally, in his eighth issue, Garcia contends the jury charge was so misleading as to cause egregious harm to Garcia as a matter of law, as it failed to properly charge the jury about accomplice testimony. We affirm the trial court's judgment.

## I. Background

After midnight on Monday, January 19, 2015, college students Rhydan Bolton and Kerrick Madison drove into a convenience store parking lot on the corner of Florida and Highland Streets in Beaumont. Kerrick drove Bolton's blue Scion that evening, and Bolton rode in the passenger's seat. Video evidence played for the jury showed two men in dark clothing approached the car and fired at least eighteen shots from semi-automatic weapons into Bolton's vehicle, killing Bolton. Madison escaped injury in the incident.

## II. The State's Theory and Evidence

### A. The State's Theory

From the trial's outset, the State tried this case under a party theory of liability. References throughout the record were to Garcia and his cousin, Kristopher Garcia,

acting in concert.[3, 4] The State contended Garcia and Kristopher were angry about being shorted in a drug deal and sought revenge against a single individual. Bolton was an innocent victim, who Garcia and Kristopher mistakenly believed was the person who shorted them in the drug transaction.

**B. Tiger Turner's Testimony[5]**

Tiger was fourteen years old when this incident occurred. He testified that around 4:30 or 5:00 p.m. on January 18, 2015, he left a friend's house to walk to a store and purchase snacks. He said that as he walked home from the store by himself, he heard a scream and someone say something about a drive-by. Then, people he did not know suddenly hopped out of a white SUV or truck and began chasing him. Tiger estimated two or three Hispanic people chased him, and while a man ultimately caught him, girls chased him as well. The abductors placed him on the floorboard of the backseat of the truck and covered his head with a bag.

Tiger testified that they drove him around to an unknown location. Eventually, they ended up at a garage or warehouse, which he identified from the sound of the

---

[3] For purposes of clarity, we will refer to the appellant as "Garcia" and to his cousin as "Kristopher."

[4] The record contains two spellings of this name, including "Kristofer" and "Kristopher." We use "Kristopher" throughout this opinion.

[5] We will refer to witnesses by their first names.

door opening and closing. At the warehouse, five or six people were present while they beat Tiger and asked him questions. Tiger testified they asked about his "homeboys" and specifically, an individual named "Anthony." Tiger told them he had a classmate in the eighth grade named Anthony, but his abductors were not satisfied. Tiger did not know the person they were seeking.

After questioning him, his abductors placed him on the backseat floorboard again and covered him up. His abductors then dropped him off on the street by his house at around 2:00 a.m. After Tiger's mother saw how he was beaten, she took him to the emergency room the next morning. Tiger spoke with the police and gave them a statement.

## C. Natalie Castillo's Testimony

Natalie Castillo testified that in 2015, she dated and lived with Garcia's cousin, Kristopher, in a house on Victoria Street in Beaumont. Natalie testified that on the evening of January 18, 2015, she and Kristopher barbecued at their house and several people attended, including Kristina Sanchez and Juana. Natalie said that around 10 p.m., Kristopher said he was going to "Lou Lou's" house to meet Garcia. "Lou Lou" is Garcia's sister, Marylou, who lived on Washington Street.[6]

---

[6] Marylou is referred to in the record as "Lou Lou" and Marylou. For convenience, we refer to this person by using her name, Marylou.

5

Natalie testified that Kristopher and Garcia sold marijuana. According to Natalie, Kristopher met Garcia at Marylou's house on that day to count money from a drug deal. Natalie said that she and everyone else stayed at the barbecue while Kristopher met with Garcia. Natalie estimated Kristopher's meeting with Garcia lasted only about fifteen minutes, and when Kristopher returned to the barbecue, he was angry because someone gave them fake money for the drugs. Natalie testified that Garcia and Kristopher thought an individual named "Dulla," who she eventually learned was Anthony Green, had given them the fake money. Kristopher told Natalie that they would worry about it later, which Natalie understood to mean that he would confront Anthony about the fake money.

Natalie testified that she, Kristopher's brother R.J., Juana, Kristina, and Kristopher eventually left the barbecue in a white Ford pickup to load tortillas at a warehouse in Beaumont rented by Garcia and his mother. Natalie identified a photograph of the white Ford pickup, and told the jury that Kristopher often drove the truck. Natalie explained that while Garcia owned the truck, Kristopher often used the truck to load tortillas on Sundays and Tuesdays.

Natalie testified that on the way to the warehouse, Kristopher stopped when they saw "three black males" walking on the side of the road. Everyone but Natalie chased the three boys. Natalie testified they caught one of the boys and put him on

the backseat floorboard, placed a blanket over his head, and asked him questions about Anthony. Natalie explained that the boy acted like he did not know anything.

Natalie told the jury they then picked up Garcia at a corner store and went to the warehouse where they planned to load tortillas. Natalie testified that Garcia and Kristopher brought the boy they picked up into a room at the warehouse. Natalie, Kristina, and Juana stood in the hallway of the warehouse. Natalie told the jury she heard the boy crying, screaming, and asking for help. Natalie estimated the boy was thirteen or fourteen, and she saw Garcia hit the boy while he was in the truck.

According to Natalie, the boy mentioned the name "Diego" while being questioned. The group left the warehouse with the boy and met Diego at a corner store. Garcia and Kristopher asked Diego questions about Anthony. Afterwards, the group, including Diego and the boy, returned to Marylou's home. Natalie told the jury that while Diego voluntarily met the group at the corner store, Kristopher and Garcia placed Diego in the truck and covered him with a blanket, along with the boy. Natalie testified that when they arrived at Marylou's around 8:00 or 9:00 p.m., Kristopher and Garcia took Diego and the boy into a room in the rear of the house while she, Juana, and Kristina sat in the living room. Natalie said she heard yelling and belts hitting someone, but she could not hear what anyone said. Natalie observed later that Diego and the boy had been beaten.

Natalie told the jury that she, R.J., and Juana left Marylou's house around 11:00 p.m. or 12:00 a.m. to finish loading tortillas at the warehouse. Natalie testified that she was one hundred percent certain Garcia was at Marylou's house that evening. She also explained to the jury that she saw Garcia holding a handgun before she left Marylou's home to go to the warehouse.

According to Natalie, she "[was] back at the warehouse somehow at 1:30 a.m." on the morning of January 19, 2015. Around this time, Kristopher, Garcia, and Garcia's brother-in-law D.J. returned to the warehouse.[7] Natalie stated they seemed nervous. She described them as being "jumpy" and "hype[d]." According to Natalie, Kristopher said "[w]e got him." Natalie explained she understood that to mean that Kristopher and Garcia killed Anthony. At some point, R.J. brought Natalie home, but she was unsure of the time. The next morning, Natalie learned someone had been shot, and she thought Kristopher and Garcia were responsible for the shooting.

Eventually, Natalie went to the police and gave a statement. According to Natalie, Garcia called her from jail and wanted to know why she talked to police. Natalie took his demand for an explanation as a threat. Garcia's mother also called her to ask her why she was cooperating with the police.

_____

[7] D.J. is alternately described in the record as Garcia's "brother-in-law," "Marylou's husband," and "Marylou's boyfriend."

8

## D. Kristina Sanchez's Testimony[8]

Kristina Sanchez testified that on MLK weekend of 2015, she attended a barbecue with Juana, Kristopher, and Natalie at Kristopher's house. While Kristina acknowledged that she and Garcia had a romantic relationship at one time, she denied she was Garcia's girlfriend. When she arrived at Kristopher's house to help prepare for the barbecue, people were already drinking alcohol and smoking marijuana. Kristina confirmed she also smoked marijuana while at the barbecue. Garcia was not there when Kristina arrived. She recalled that after Kristopher received a phone call, he left the house to meet with Garcia. Kristina testified that Kristopher was not gone long before he returned.

Later that same evening, Kristina, Juana, Kristopher, Natalie, and R.J. left in Garcia's white Ford pickup to load tortillas for Garcia's mom. Kristina estimated they left an hour or two after Kristopher returned from his meeting with Garcia. Kristina testified that on the way to the warehouse, they stopped the truck when they saw three guys walking along the road. Kristina explained that at the time, she did not know why they stopped. Later, Kristina learned they stopped because Kristopher and Garcia thought they were given fake money for drugs and they were searching

---

[8] Kristina Sanchez was also called "Neca" in the record. For convenience, we refer to her as "Kristina."

for the man who gave them the fake money. Kristina described the guys on the road as black males. They all exited the truck and chased the guys. Kristina testified that they caught one of the teenagers. R.J. put him in the backseat of the pickup truck and covered him with a blanket.

Kristina testified that she, Juana, Natalie, Kristopher, and R.J. drove the teenager to the warehouse. On the way, they picked up Garcia. After they arrived at the warehouse, Kristopher and Garcia asked the teenager questions. Kristina was in the room while Kristopher and Garcia questioned the teenager. Kristina testified Garcia was on the phone with someone while he asked questions of the teenager. Kristina explained that things got physical, and they were asking questions trying to locate a person called "Dulla." Kristina testified she did not know who Dulla was, but later learned his name was Anthony. Kristina confirmed that she saw Kristopher and Garcia hit the teenager, who cried and seemed scared.

After leaving the warehouse, the group met Diego at a gas station. Kristina said that once Diego was in the truck, they drove around to different houses Diego pointed out, looking for "Dulla" or Anthony. When they did not find him, the group returned to Marylou's house. Upon arriving at Marylou's home, everyone went inside. Kristina testified that she, Juana, Natalie, and Marylou stayed in the living room while the guys took Diego into the back room. Kristina testified she heard

10

"banging" as if someone was being beaten in the back room. Eventually, R.J. came inside with "the kid" and took him to the back room. After that, she heard more banging.

Kristina testified that Garcia, Kristopher, Diego, "the kid," and D.J., left Marylou's house in a green Avalanche, which Kristina said was owned by Garcia's brother in law, D.J. Kristina testified the group left expecting to meet Anthony at a gas station. According to Kristina, Garcia and Kristopher returned to Marylou's house in the early morning hours of January 19, 2015. Kristina said that when the group returned, Garcia fell asleep on the couch, while Kristopher was talkative, active, and jumpy. Kristina testified that Kristopher told them "they had shot somebody's car up, but . . . he just seen someone ducking down, that he don't (sic) know if they'd been hit or not." Kristina testified that Kristopher said the shooting occurred at a store.

Kristina learned from Facebook that someone had been shot at a store. She wondered if it was the shooting that Kristopher had described. From her recollection of the events of that evening, Kristina believed that Kristopher and Garcia shot somebody. Kristina stated that Kristopher and Garcia owned guns, and she believed Kristopher had a gun the night the shooting occurred, because she saw him with his hands in the waistband of his pants.

11

Kristina gave a sworn statement to the police. She also gave a sworn statement to defense counsel while Garcia's mother was with her. Kristina explained she told defense counsel that Garcia was not with the group that evening because she wanted to protect him, and admitted she was not telling the truth when she said Garcia was not there. She testified that the statement she gave to the police was truthful.

During cross-examination, Kristina admitted telling defense counsel that she was really screwed up from smoking marijuana and drinking alcohol that night, and she really did not know what happened. Kristina denied to defense counsel that Garcia ever hit the teenager in the white truck. She denied that Natalie went back to the warehouse after Kristopher and Garcia left. Kristina said that after Garcia returned to Marylou's home, he spent the rest of the night there. Kristina said later that morning, around 6:00 a.m., they took everyone who was still at Marylou's home back to their own homes.

## E. Diego Torres's Testimony

Diego Torres testified and admitted he gave police several different statements about the events of the evening in question.[9] He also admitted to lying in

---

[9] During Diego's testimony, the trial court conducted a hearing outside the presence of the jury to determine if certain statements of Garcia said to Diego would be allowed. Garcia approached Diego in the jail dormitory and attempted to bribe or threaten Diego into changing his testimony. Diego was being held in the jail

12

his first three statements to the police. He recounted various versions of the story he first gave to law enforcement. That said, Diego maintained that he told the truth in his fourth statement to the police.

Diego testified he was at his cousin's house playing video games when he received a phone call informing him that Garcia was looking for him and wanted to meet him at a gas station nearby. Diego testified that his cousin dropped him off at the gas station to meet Garcia. Diego told the jury that he got into a white Ford pickup that Kristopher was driving. Juana was in the front seat with a girl he did not know, and Garcia and Kristina were in the backseat, together with a "little kid" covered with a blanket. When they removed the blanket, so he could see the individual's face, Diego told the group that he did not know the young teenager. Diego testified that the teenager had bruises on his face.

Diego testified he knew Anthony Green, who went by the name "Dulla." Diego said while the group drove him around, they asked if he knew where Anthony lived. Diego told them he did not know. Diego said that he understood Anthony owed Kristopher and Garcia money for drugs.

---

overnight to ensure his presence at the trial the next day and, through administrative error, the two were housed in the same area of the jail. The trial court ruled the statements would be allowed.

Diego testified that the two men took him to a house on Washington and when they arrived, they first took the teenager inside and left Diego in the backseat. After a while, the men placed a hood on his head and took him inside also. Diego said they asked him more questions once inside the house. When he could not provide them with the answers they wanted, the men became angry and hit him. At times, they questioned him alone and at other times, the men placed him and the teenager they called Tiger in the same room while questioning them and beating them. At times, Diego could not tell who asked the questions, as they spoke in English and Spanish. Diego testified that he heard them beat Tiger, who was crying, scared, and acted like he did not know who or what they were talking about.

Diego testified that later, Garcia, Kristopher, and D.J. put him in the front passenger floorboard of another truck and told him they were taking him home. He suggested that D.J. drove, and Kristopher and Garcia rode in the backseat. Rather than take him home, they took him to a gas station at the corner of Florida and Highland. Diego said they had a jacket over his head while they drove around, and they stopped when they said they saw Dulla at the gas station. They made Diego peek out the window and they asked him if he saw Anthony at the store, and he told them he did not. Diego testified that they told him they did not believe him and felt he was trying to protect Anthony. Diego told the jury he heard Kristopher and Garcia

14

asking each other if they had the guns and ammunition. Diego saw Garcia with a gun earlier, before they put him in the truck. Diego testified that Kristopher and Garcia exited the truck, and shortly after, Diego heard gunshots, but he did not see the shooting. Diego thought he heard at least ten gunshots. Diego testified that after the shooting stopped, Kristopher and Garcia jumped in the truck "saying that they got him, that they knew they hit somebody . . . they shot . . . directly at them and [knew] they had got (sic) somebody." Diego told the jury that before they released him, Garcia threatened him. Specifically, Garcia told Diego that if he went to the police, they would harm his family, which Diego took seriously. The next day, though, he told his girlfriend and her mother what happened, and they insisted he tell the police.

The trial court held a hearing outside the jury's presence to address the admissibility of certain testimony the State intended to introduce through Diego. After the trial judge allowed the testimony before the jury, Diego testified that at the time of trial, he was incarcerated on an unrelated drug conviction and transferred to the Jefferson County Jail the night before the trial began so he would be available to testify. Because of an administrative error, he was housed in a jail dormitory with other prisoners and Garcia approached him there, which scared Diego. Diego explained that Garcia told him to testify that Garcia was innocent and that the police

coerced Diego to give the incriminating statements. In return, Garcia would help Diego by bonding him out, getting him a good lawyer, and helping his family. Diego confirmed Garcia wanted him to lie on the stand and convince everyone Garcia was not guilty. According to Diego, Garcia told him that if Diego was charged with perjury for changing his testimony, Garcia would help him out.

The defense questioned Diego's credibility on cross-examination. Diego admitted he smoked a lot of marijuana around the time of the shooting and he was sentenced to confinement in a rehabilitation program at the time of trial. Diego testified that because of his many conflicting statements, the police did not believe him, thought he was involved in the crime, and at one time, also charged him with the murder. But later, the police told Diego that other witnesses confirmed what he told the police in his last statement, and they dismissed the charges.

The defense also questioned Diego about information he posted on his Facebook page containing profanity and discussing murder. Diego explained the Facebook posts quoted song lyrics, and he identified the songs for the jury. The defense also admitted a photograph of a dark Chevrolet Avalanche, which Diego confirmed belonged to his family. Diego testified that while the Avalanche belonged to his mother, he never obtained a driver's license, so his mother did not let him

drive the vehicle. He denied that it was his mother's vehicle in the videotape from the night of the murder.

**F. Testimony of Kerrick Madison**

Kerrick Madison was with Rhydan Bolton the night of the shooting. Both men were students at Lamar University. Sometime after midnight, following a fraternity meeting, Kerrick and Bolton went to a store located at Florida and Highland. Kerrick testified that he drove Bolton's car that evening, and Bolton was in the passenger's seat. Kerrick testified that an acquaintance of his was at the store and approached him in the parking lot and asked him for some change. Kerrick gave the man some money, told him to get whatever he wanted, to get what Kerrick needed and return the change. Kerrick testified that he and Bolton never exited the vehicle. Kerrick said that while they waited in the car, someone started shooting at the car. Kerrick testified he ducked down as low as he could, because the shots came from outside the driver's side of the vehicle. Kerrick testified he waited until the gunshots stopped and he felt it was safe to get up, and that is when he saw blood on Bolton's neck and discovered he was dead. Kerrick went inside the store and called 911. Kerrick had no idea why someone would shoot at him or Bolton. He stated he and Bolton had not been in any fights, they were good guys, and they did positive things on campus.

## G. Detective Sergeant Patrick Barton's Testimony

Detective Sergeant Patrick Barton with the Beaumont Police Department testified that at around 1:00 a.m. on January 19, 2015, he was called to a convenience store on the corner of Florida and Highland in Beaumont. A patrol officer informed him there had been a shooting, and there was a deceased male in a car in front of the store. He testified that based on the location of shell casings, the shooters likely stood in front of the laundromat next to the convenience store.

Detective Barton testified that when he arrived at the scene, he spoke with Kerrick Madison and obtained a sworn statement from him. Barton also obtained video from the store's cameras and from a store across the street. The State played the surveillance video for the jury while Detective Barton testified. Detective Barton described what the video depicted, and he noted an "Avalanche-type vehicle" driving down an alleyway. Detective Barton explained it was unusual that the vehicle turned down an alleyway and sat there, and if they were not investigating a homicide, he would have thought individuals were casing the store to rob it. Watching the video, Detective Barton explained the same vehicle eventually exited the alleyway. The police could not obtain a license plate number from the video. Detective Barton testified that on the video, it appeared the vehicle stopped right by

the laundromat. The Avalanche then pulled out of the parking lot with its lights off, which the detective found suspicious since it was 1:00 a.m. and dark outside.

Detective Barton testified that shortly thereafter, two shooters approached the store from the direction the Avalanche exited the parking lot. Detective Barton said that after the two individuals shot into the car, they fled in the Avalanche's direction. Detective Barton testified that he and another detective drove around that part of town afterwards to try to locate the Avalanche seen in the video. After they spotted a vehicle matching the Avalanche's description in the driveway of a home on Washington, Detective Barton stopped at the house and examined the vehicle. He also noted a white Ford pickup at the residence. Detective Barton testified that the Avalanche was registered to Marylou Garcia at that same address.

After their investigation, the police eventually identified Garcia and Kristopher as their shooting suspects. While the police never located the two murder weapons, the detective stated that was not unusual.

**H. Dr. John Wayne's Testimony**

Dr. John Wayne is a forensic pathologist who performed the autopsy on Rhydan Bolton. Dr. Wayne revealed Bolton sustained two gunshot wounds to the head and neck area. Dr. Wayne testified Bolton's cause of death was multiple gunshot wounds to the head and neck, and his manner of death was homicide. Dr.

19

Wayne testified the injuries to his head and neck independently or together could have been fatal. During the autopsy, the doctor retrieved two bullets from Bolton's body and turned them over to the police as evidence.

**I. Brandy Dyson's Testimony**

Brandy Dyson was the Beaumont Police Department Crime Scene Technician called to the convenience store to process the crime scene. Dyson told the jury that when she arrived at the scene, she observed two vehicles with bullet holes in them; one contained a deceased body. Dyson confirmed the bullets came from the direction of the laundromat adjacent to the convenience store. Dyson testified she found at least eight bullet holes in the Scion.

**J. Brandy Henley's Testimony**

Brandy Henley is a forensic scientist firearms examiner with the Jefferson County Regional Crime Lab in Beaumont, Texas. Henley testified they recovered ten .40 caliber Smith & Wesson shell casings from the scene. After examining the casings, she determined that all ten were fired from the same firearm. The characteristics of the shell casings were consistent with a Smith & Wesson Sigma Series firearm. Likewise, Henley testified they determined that several .380 shell casings retrieved from the scene were fired from a single firearm. The characteristics of those shell casings were consistent with being fired from a Hi-Point manufactured

pistol, although she could not exclude other manufacturers. They identified the two bullets removed from Bolton's body as .380 caliber.

### K. Orlando Garcia's Testimony

Orlando Garcia testified in his own defense. He acknowledged that he had served two years in prison when he was sixteen, and he blamed Kristopher for his prior offense. Garcia testified that Kristopher worked for him at the time of the shooting, and Kristopher drove Garcia's white Ford F-150 pickup for work. Garcia testified that his mother rented a warehouse in Beaumont for the business and Kristopher had a set of keys and the security pass code to the warehouse. Garcia claimed the warehouse had security cameras, but the defense offered no surveillance video from the warehouse to dispute the witnesses' testimony from the night of the shooting.

Garcia testified he woke up early on January 18, and his mother took him to the warehouse to load the truck. After he loaded the truck, Garcia said he travelled to Houston with his ex-girlfriend and their baby to purchase tattoo supplies. Garcia testified that when he returned from Houston, he went by the warehouse to make sure everything was ready for the next day and went home from there, arriving

around 6:00 p.m.[10] Garcia told the jury that he and his family had a barbecue at his mother's house in Lumberton for his little sister's anniversary.[11] He testified he stayed at the house all night and went to sleep around 11:30 p.m. Garcia told the jury that his mother woke him up around 2:30 or 3:00 a.m. for work. Garcia specifically denied that he left the house to meet Kristopher and the others. He also denied going to his sister's house on Washington Boulevard that evening. Garcia likewise denied ever being at the convenience store at Florida and Highland in the early morning hours of January 19, denied knowing Anthony Green, riding in an Avalanche on the evening in question, or being in his white pickup on that day. Garcia also denied having a gun and shooting into the car.

Garcia denied knowing Diego or speaking with Diego before his arrest. Even so, Garcia admitted to talking with Diego in jail, but he denied he tried to bribe Diego or that he asked Diego to lie. Instead, Garcia testified that Diego demanded money from him. Garcia then explained he told Diego that, if Diego told the truth and got in trouble, ". . . I would give him an attorney." Garcia said that by telling the truth,

---

[10] Previous witnesses testified that Garcia lived in Lumberton, Texas with his mother.

[11] This was a separate barbecue from the one at Kristopher's house and was a planned anniversary party for his sister.

he meant Diego should say he was not there, because Diego knew Garcia was not there.

Garcia testified he talked to the police, who at first questioned and released him, but arrested him two months later. Garcia acknowledged he knew Natalie, and he admitted Kristina was "someone [he] was talking to at one point."

While Garcia admitted he was a convicted felon by the age of sixteen, he denied that he sold drugs or threatened Diego. Garcia also testified that if his truck was involved in the crime, it was Kristopher's fault because Kristopher had Garcia's truck. Garcia accused Diego of lying. In fact, Garcia asserted that everybody who testified at trial against him was lying, and he specifically complained that Kristina and Natalie lied to the jury.

## L. Other Evidence

The State offered and the trial court admitted surveillance video obtained from the convenience store and laundromat the day the shooting occurred. Detective Barton explained the footage during his testimony. The video shows that shortly before Bolton's Scion pulls into the convenience store's parking lot, a dark-colored Chevrolet Avalanche is seen pulling into the parking lot, but nobody is seen on the video getting out of the truck. About twenty seconds later, the Scion is seen arriving around 1:01 a.m. Another person, who is already in the parking lot, can be seen

23

walking up to the Scion and speaking to the person who was driving. The driver hands the person money, and that person goes into the store.

At 1:02 a.m., the video shows the Avalanche leaving the convenience store parking lot with its lights off, pulling down the street and disappearing from sight. At 1:03 a.m., one camera angle shows two people approaching from the same direction the Avalanche left the parking lot from. Two shooters, dressed in dark clothing, approach Bolton's Scion and fire several shots into the car. The shooters then flee back in the direction they came from. Another camera angle shows many bullets hitting the Scion, but the shooters cannot be seen on the video associated with that camera.

After the shooters flee, the driver of the Scion, Kerrick, is seen jumping from the car and running into the store. A few minutes later, Kerrick is seen talking on the phone and going in and out of the store until police arrive around 1:11 a.m.

**M. Other Testimony**

A friend of Garcia's family and several of Garcia's family members, including his mother, his little sister, and his sister's husband testified for the defense in support of Garcia's alibi. These witnesses all testified they saw Garcia at his mother's house in Lumberton at the barbecue and never saw him leave that night.

24

Two of the witnesses stated they left the barbecue before midnight and did not know where Garcia was after they left.

### III. Course of Trial Proceedings

### A. Hearing Regarding Admissibility of Hearsay Statements

When Natalie testified that Garcia and Kristopher were given fake money and "ripped them off" in a drug deal, the defense objected based on hearsay. The trial court conducted a hearing outside the jury's presence to determine the admissibility of hearsay statements Kristopher allegedly made on the night of the murder to Natalie, Kristina, and Diego, all of whom testified at trial. During the hearing, each witness testified about the circumstances surrounding Kristopher's statements. Natalie discussed the events leading up to the murder. She explained that someone shorted Garcia and Kristopher money in a drug deal earlier in the day. After meeting with Garcia to count their money, Natalie said that Kristopher returned to their house alone. Kristopher was mad about the money but said he would take care of the matter later. Natalie believed that meant Kristopher would confront the thief.

She described how they grabbed the boy, Tiger Turner, off the street and covered him with a blanket, then Kristopher and Garcia beat him at the warehouse trying to locate Anthony. Natalie testified that while at the warehouse, she heard someone being beaten in another room. Natalie testified that when they asked the

25

boy questions, the boy did not seem to know who they were talking about. Natalie explained that after leaving the warehouse, they picked up Diego. Natalie described going to Marylou's house on Washington and sitting in the living room with the girls while the guys took the boy and Diego into the back room. She told the jury she heard Kristopher and Garcia beating the boy and Diego in another room. Natalie also testified she saw Garcia with a gun that night. She said she stayed at the house on Washington until possibly 1:30 a.m., then returned to the warehouse to load tortillas with R.J. and Juana. Eventually, Garcia, Kristopher, and D.J. arrived at the warehouse in a blue Avalanche owned D.J. and Marylou. Natalie described their behavior as "hype" and "jumpy." Natalie testified that when Kristopher came into the warehouse, he told her "[w]e got him[,]" which she understood to mean he and Garcia killed Anthony.

Kristina Sanchez also testified during the hearing about the events leading up to the murder. Her version of events was similar in most respects to that testified to by Natalie. She conveyed they were at Kristopher's home on Victoria for a barbecue, and at some point, Kristopher left to meet Garcia. She said Kristopher returned to the house by himself, and a group, including herself, Natalie, R.J., Kristopher, and Juana left for the warehouse to load tortillas. She testified that Kristopher said someone gave him "fake money." On the way to the warehouse, they stopped and

began chasing some guys down the street and grabbed one "little boy." They put the boy on the backseat floorboard and drove him to the warehouse. She described the boy as scared. When they arrived at the warehouse, Kristopher and Garcia questioned and beat the boy.

During the hearing, Kristina testified that they left the warehouse to meet Diego at a convenience store. Diego showed them where he thought Anthony lived. They then drove to Marylou's house on Washington where the girls remained in the living room while the guys took Diego and "the kid" into a back room. Kristina said they heard Kristopher and Garcia beating the other two guys. Kristina said she saw Kristopher with his hands in the waistband of his pants, which led her to believe he had a gun, but she did not see Garcia with a gun.

Kristina testified that Garcia, Kristopher, Diego, D.J., and the little boy left the house on Washington together in the Avalanche to meet "Dulla." She said that when Kristopher and Garcia returned to Marylou's house later, Garcia fell asleep on the couch, but Kristopher talked. Kristina testified that Kristopher said he and Garcia shot at a car, but he did not know if they hit anyone.

Kristina testified she could not recall if the group returned to the warehouse to load tortillas after the guys left. She recalled they stayed at Marylou's all evening,

27

and Kristopher and Garcia returned to Marylou's. Kristina admitted she was drunk and high on the night of the shooting.

During the hearing, Diego testified about statements he attributed to Kristopher and Garcia. He said he was at his cousin's house watching movies and received a call from Garcia to meet him at a gas station and explained that he went because Garcia threatened him. Diego testified that Garcia told him if he did not meet him, Garcia would shoot up his family and his house. Garcia told Diego Anthony Green robbed him and owed him money. Diego stated that he knew Anthony because he purchased marijuana from Anthony. Diego testified Garcia and others, including Kristopher, Kristina, Juana, and a girl he did not know, picked him up in a white four-door Ford truck. Diego also testified that there was a "kid" in the backseat, hooded and afraid.

Diego testified that when he got into the truck, they drove around trying to find out where Anthony lived, but Diego did not know. When they did not locate Anthony's residence, the group took him to a house on Washington where everyone exited the truck except Diego and Kristopher. A bit later, Kristopher covered Diego's head and brought him inside. Once inside the house, they asked Diego more questions about Anthony and, when he did not give them the answers they wanted,

28

they beat him. He said they did the same to the kid. Diego testified the kid did not seem to know anything about what was going on.

Afterwards, they put Diego into a different truck on the front passenger floorboard. Garcia and Kristopher were in the truck, and D.J. drove. According to Diego, the four of them drove to a convenience store at the corner of Florida and Highland, where the men instructed Diego to raise his head and look out the window at a guy in the car next to them. They wanted to know if he recognized the passenger as Anthony, but Diego told them he did not recognize him. Diego testified they thought he lied to protect Anthony and pushed him back onto the floor.

According to Diego, just before Kristopher and Garcia exited the truck, he heard them say they knew it was Anthony, and they were going to get him, and they asked each other if they were ready. Diego believed they were going to shoot the person they thought was Anthony. Diego testified Kristopher and Garcia jumped out of the truck and he heard gunshots soon afterwards, but he could not see what happened. Diego said he observed Garcia with a black handgun earlier that night. Diego also testified that when Kristopher and Garcia re-entered the truck, they said, "I got him, I got him."

Following the testimony of the three witnesses outside the presence of the jury, the trial court ruled the statements made by Kristopher in the presence of these

witnesses would be allowed. The trial court found Kristopher's statements to the three witnesses were non-testimonial in nature, they were all blame-sharing or against the interest of Kristopher and did not necessarily shift blame to Garcia. After making that determination, the trial court concluded there was sufficient corroborating circumstances to support the trustworthiness of the hearsay statements under the *Fratta* and *Dewberry* cases, and the court would allow the witnesses to testify to the statements as an exception to the hearsay rule.

## B. Motion for Instructed Verdict

The defense moved for instructed verdict and argued the State failed to prove their case beyond a reasonable doubt "reaching every element that is alleged in this cause under the statute of murder for insufficient evidence." The trial court denied the motion.

## C. Charge Conference

During the charge conference, the trial court asked whether the parties had any objections or additions to the charge. The defense stated on the record that it did not. The charge contained no instruction for an accomplice as a matter of law. Instead, it contained the following instruction for an accomplice as a matter of fact:

**ACCOMPLICE WITNESS AS QUESTION OF FACT:**

An accomplice, as the term is used here, means anyone connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime by unlawful act or omission on their part transpiring either before, at the time of, or after the commission of the offense, and whether or not they were present and participated in the commission of the crime.

You are instructed that a conviction cannot be had based solely on the testimony of an accomplice unless the jury believes that the accomplice's testimony is true and it shows the defendant is guilty of the offense charged against him, and even then you cannot convict unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged. The corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission.

Now if you believe from the evidence beyond a reasonable doubt that an offense was committed as charged, and you further believe that a witness was an accomplice, or you have a reasonable doubt as to whether he was or not, then you cannot convict the defendant upon his testimony unless you first believe that their testimony is true and that it shows that the defendant is guilty as charged in the indictment; and then you cannot convict the defendant unless you further believe that there is other evidence in the case, outside of the testimony of the accomplice, tending to connect the defendant to the offense, and then from all of the evidence you must believe beyond a reasonable doubt that the defendant is guilty.

The court's charge to the jury also instructed jurors:

Now, if you believe from the evidence beyond a reasonable doubt that in Jefferson County, Texas, on or about January 19, 2015, the defendant Orlando Garcia did then and there intentionally or knowingly cause the death of an individual, namely: RHYDAN CHARLES BOLTON, by shooting RHYDAN CHARLES BOLTON with a firearm, you shall find the defendant GUILTY of the offense of Murder.

31

Unless you so find, or if you have reasonable doubt thereof, you shall find the defendant NOT GUILTY.

The jury charge did not contain a law of parties instruction nor did the indictment mention law of parties. The jury found Garcia guilty of murder as charged in the indictment.

## IV. Analysis

### A. Issues One through Four: Legal Sufficiency

In his first four issues, Garcia argues that the evidence is insufficient to support his conviction for murder. *See* Tex. Penal Code Ann. § 19.02(b)(1). Garcia contends that because the jury charge allowed the jury to convict him only as a principal, rather than as a party, no rational trial of fact could have found all the essential elements beyond a reasonable doubt. Here, the State charged Garcia with murder by alleging he intentionally and knowingly caused the death of Rhydan Bolton by shooting him with a firearm.[12] An individual commits murder if he "intentionally or knowingly causes the death of an individual[.]" *Id.* In issues one through three, Garcia challenges the sufficiency of the evidence of each element of

---

[12] The language of the murder statute reads "intentionally *or* knowingly" not "intentionally *and* knowingly" as the indictment alleges. Tex. Penal Code Ann. § 19.02(b)(1) (West 2019) (emphasis added).

the crime. He contends the evidence is legally insufficient to prove he "caused the death" of Bolton, that he did it intentionally, or that he did it knowingly.

When there is a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)) (concluding the *Jackson* standard "is the only standard that a reviewing court should apply" when examining the sufficiency of the evidence); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "[We] must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible." *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). The jury is the sole judge of the witnesses' credibility and weight to be given to their testimony. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). Juries may draw multiple reasonable inferences from facts so long as each inference is supported by the evidence presented at trial. *Id.* Accordingly, we must defer to the jury's determinations of weight and credibility of the witnesses. *See Brooks*, 323 S.W.3d at 899. A challenge to the trial court's denial of a motion for instructed verdict operates as a challenge to the sufficiency of the

evidence. *Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993); *Madden v. State*, 799 S.W. 2d 683, 686 (Tex. Crim. App. 1990).

Since *Malik*, the Texas Court of Criminal Appeals has recognized that the sufficiency of the evidence should be measured by a hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) ("[S]ufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case."). We apply the *Jackson* evidentiary sufficiency standard to the hypothetically correct jury charge. *See Adames v. State*, 353 S.W.3d 854, 862–63 (Tex. Crim. App. 2011) (determining "[t]he court of appeals correctly applied the *Jackson* evidentiary-sufficiency standard to the hypothetically correct jury charge" in conducting its evidentiary-sufficiency review and correctly found that the evidence was legally insufficient to support appellant's conviction as a primary actor, but legally sufficient to support his conviction as a party). A hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately described the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240; *see also Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000). Here, "law" as "authorized by the indictment" is defined as the statutory

34

elements of the offense of murder "as modified by the charging instrument." *See Curry*, 30 S.W.3d at 404.

Garcia makes a legal sufficiency argument, choosing not to pursue a due process claim. *See Wooley v. State*, 273 S.W.3d 260, 268–69 (Tex. Crim. App. 2008) (explaining distinction between due process rule and an evidentiary sufficiency rule).[13, 14] It is not lost on this Court that by asserting a legal sufficiency challenge, Garcia seeks an acquittal as opposed to assigning charge error that would result in a remand. Garcia was indicted for murder using a firearm and convicted of murder. The case, while tried on a theory of party liability that went unsubmitted to the jury, resulted in a conviction for murder as charged in the indictment. This was not a

---

[13] In *Wooley v. State* the Texas Court of Criminal Appeals discussed due process violations when a conviction is based on an unsubmitted theory. 273 S.W.3d 260, 271–72 (Tex. Crim. App. 2008) (quoting *McCormick v. U.S.*, 500 U.S. 257, 270 n.8 (1991) ("Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.")). That said, the Court further explained in *Adames v. State* that "[t]he *McCormick/Dunn/Cole* rule applies only when a defendant is convicted on a charge that was neither alleged in an indictment nor presented to the jury, as the defendant is then not given sufficient notice as to the specific charge." 353 S.W.3d 854, 859–60 (Tex. Crim. App. 2011).

[14] On remand from the Court of Criminal Appeals, the Fourteenth Court of Appeals concluded in *Wooley* that the evidence was sufficient to support the jury's verdict of guilty. *Wooley v. State*, No. 14-06-00088-CR, 2009 WL 3378504, *5 (Tex. App.—Houston [14th Dist.] Oct. 22, 2009, pet. ref'd) (mem. op., not designated for pub.).

situation in which a kidnapping charge transformed into an aggravated robbery charge or an aggravated robbery charge became murder. Garcia was charged with the offense of murder for causing the death of Rhydan Bolton, and the jury convicted him of that offense. *See Adames*, 353 S.W.3d at 860 ("This is a case of jury-charge error distinct from an evidentiary insufficiency; appellant was convicted on a theory, guilt as a party, that was not presented to the jury, as opposed to a charge for which he was never tried."). As the court in *Malik* stated, the rule they formulated of measuring sufficiency against a hypothetically correct charge "ensures that a judgment of acquittal is reserved for those situations in which there is an actual failure in the State's proof of the crime rather than a mere error in the jury charge submitted." *Malik*, 953 S.W.2d at 240.

The record before us reveals the State charged Garcia with the offense of murder and tried this case under a party theory of liability. Garcia seems to recognize this and characterizes Kristopher as a "co-defendant" in his brief. The testimony of the State's witnesses allowed the jury to conclude that Garcia and Kristopher acted together the night of the murder. The State presented evidence that they conducted a drug deal earlier in the day, and they sought to retaliate because a buyer gave them fake money for the drugs. The evidence revealed they beat witnesses together, left Garcia's sister's house together with weapons in a truck matching the one captured

on video at the scene, and two shooters fired several shots into Bolton's vehicle. We conclude a hypothetically correct charge in this case would have included a law of parties instruction, and we will conduct our legal sufficiency analysis accordingly. *See Adames*, 353 S.W.3d at 862–63.

A defendant commits the offense of murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). Here, the indictment alleged that Garcia "intentionally and knowingly cause[d] the death of . . . RHYDAN CHARLES BOLTON, . . . by shooting [him] with a firearm[.]" A person is a party to an offense if "the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a) (West 2011); *see also Adames*, 353 S.W.3d at 861. A law of parties instruction would have informed the jury that "a person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" Tex. Penal Code Ann. § 7.02(a)(2) (West 2011). Thus, applying the law of parties to the murder statute, Garcia was criminally responsible as a party to the offense of murder committed by another if acting with the intent to promote or assist in the commission of the murder,

37

he solicited, encouraged, directed, aided or attempted to aid the other person to commit murder. *See id.* §§ 7.01(a), 7.02(a)(2), 19.02(b)(1).

While Garcia contends that the charge authorized conviction only as a principal to the murder, since *Malik* we examine the evidence against a hypothetically correct charge. *See Adames*, 353 S.W.3d at 862–63; *see also Geick v. State*, 349 S.W.3d 542, 545 (Tex. Crim. App. 2011). Law of parties abolishes the notion of principals or accomplices. Tex. Penal Code Ann. § 7.01(c) (West 2011) ("All traditional distinctions between accomplices and principals are abolished by this section, and each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice."). In *Adames*, the Court of Criminal Appeals determined the intermediate appellate court applied the proper standard in conducting its evidentiary sufficiency review and correctly found the evidence insufficient to support the defendant's conviction as a primary actor, but legally sufficient to support his conviction as a party. 353 S.W.3d at 861. The Court explained that the State did not plead the parties theory in the indictment, which neither state nor federal law required, and while the jury charge included a general instruction on the law of parties, it did not properly apply the law to the elements specific to the facts in that capital murder case. *See id.*

Once we ascertain the substantive elements of the offense as set out in a hypothetically correct jury charge, we measure the evidence viewed in the light most favorable to the verdict against those elements. *See id.*, 353 S.W.3d at 862. "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). When a jury's verdict could have been based on an accomplice's testimony, the standard of review is "whether the evidence could be viewed by a rational juror as tending to connect the defendant to the offense committed." *See Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009) (citation omitted). In assessing whether non-accomplice evidence tends to connect a defendant to the offense, "'the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense.'" *Id.* (quoting *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (internal quotes omitted); *Holladay v. State*, 709 S.W.2d 194, 199–200 (Tex. Crim. App. 1986)).

In our review, we eliminate all accomplice testimony from consideration and examine the remaining parts of the record to determine if any evidence tends to

connect the accused with the commission of the crime. *See Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007) (citing *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). Corroborating evidence, standing alone, need not be sufficient to establish guilt—there simply needs to be other evidence tending to connect the defendant to the offense. *Id.* To determine whether a rational juror could find the evidence tends to connect the appellant to the offense, the court must view the non-accomplice testimony together instead of as isolated, unrelated incidents. *Simmons*, 282 S.W.3d at 511; *Mitchell v. State*, 650 S.W.2d 801, 807 (Tex. Crim. App. 1983) ("The combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission of the offense supplies the test.").

Here, we look to the non-accomplice testimony and evidence together, instead of as isolated incidents, to determine if it to tends to connect Garcia to the offense of murder. *See Simmons*, 282 S.W.3d at 511; *Mitchell* 650 S.W.2d at 807. We also look to the events before, during, and after the alleged crime. *See Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) (citations omitted) ("[T]he accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect

40

the accused to the offense."). Viewing the non-accomplice testimony and evidence together, we conclude it tends to connect Garcia to Rhydan Bolton's murder. The testimony in the records allowed the jury to infer that Garcia and Kristopher were angry because they were "ripped off" in a drug deal earlier in the day. Additionally, there was testimony from individuals who witnessed Garcia and Kristopher beating victims they kidnapped in an attempt to glean information about the individual they believed paid for the purchase using fake bills. Two witnesses observed Garcia with a handgun that night and another observed Kristopher with a gun. Diego described being with Kristopher and Garcia right before the murder at the same convenience store where Bolton's murder occurred. He also described hearing several gunshots shortly after Garcia and Kristopher left the truck.

Several witnesses testified that Garcia and Kristopher left Marylou's home in a dark-colored Chevrolet Avalanche driven by Garcia's brother-in-law. Surveillance video captured a vehicle matching this description pulling into the parking lot of the convenience store where the murder occurred. Moments after the truck left the parking lot and disappeared from the video, two unidentifiable individuals in dark clothing approach the Scion from the direction the truck left and fire into the Scion. Diego Torres's description of the events matches the events seen on the videos of the shooting. He testified Kristopher and Garcia had him on the floor of the vehicle

41

covered up, and when they arrived at the gas station they made him look out the window to confirm whether Anthony Green was in the store. Diego denied he was there, but they did not believe him, so they shoved him back on the floorboard of the truck. Diego testified that he felt the vehicle back up and move a short distance when he heard Garcia and Kristopher leave the truck. Diego testified that a short time later, he heard many gunshots before Garcia and Kristopher returned to the truck. Diego also related that he overheard Garcia and Kristopher talking back and forth saying "we got him, we got him." At least a portion of that discussion included statements that Garcia made.

The State's ballistic expert testified that the projectile fragments and casings located at the scene came from two weapons, a .380 caliber and .40 caliber, consistent with a two-shooter theory. The State's forensic expert testified that the bullet fragments removed from Bolton's body came from the same .380 caliber weapon. The guns were never recovered, and it was unknown which gun Garcia had that night.

The statements Kristopher made that Natalie, Kristina, and Diego overheard had to be corroborated by non-accomplice testimony tending to connect Garcia to the offense. *See Simmons*, 282 S.W.3d at 511; *Mitchell* 650 S.W.2d at 807; *see also Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007). The jury could have

decided that Natalie, Kristina and Diego were not accomplices and their testimony tended to connect Garcia to the murder.

We now look at the statements attributed to Kristopher. Diego testified that while they were in the SUV and at the corner grocery store, he overheard Kristopher and Garcia talking to each other and asking if they had the guns and the ammunition. He also testified that when they jumped back into the truck, they said they "got him," they "knew they hit somebody," and they "shot . . . directly at them[.]"Natalie testified that she saw Kristopher and Garcia later at the warehouse and described them as "hype" and "jumpy[,]" and Kristopher said, "We got him." Natalie testified she took that to mean they killed him. Likewise, Kristina testified that when Kristopher and Garcia returned, Kristopher said "they had shot somebody's car up, but he didn't -- but, um, he just seen (sic) someone ducking down, that he don't (sic) know if they'd been hit or not."

When examining the sufficiency of the evidence against a hypothetically correct charge, which would have included a law of parties instruction in this case, we determine the evidence is legally sufficient to establish Garcia caused Bolton's death by shooting him with a firearm. We overrule issue one.

Texas Penal Code section 6.03 defines culpable mental states. *See* Tex. Penal Code Ann. § 6.03 (West 2011). "A person acts knowingly, or with knowledge, with

respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). A specific intent to kill can be inferred from the use of a deadly weapon, here a firearm. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant."); *Medina v. State*, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999) ("[T]he use of an automatic weapon under these circumstances was a 'manner of use' in which death or serious bodily harm was a likely result. Opening fire with an automatic rifle, at close range, on a group of people supports the conclusion that appellant acted with the specific intent to kill."); *Vuong v. State*, 830 S.W.2d 929, 934 (Tex. Crim. App. 1992) (quoting *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986) ("'The specific intent to kill may be inferred from the use of a deadly weapon, unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result.'")).

The evidence allowed the jury to conclude that Garcia fired multiple rounds with a handgun into an occupied vehicle at close range. Thus, the guns were used in a manner where death could likely result. *See Medina*, 7 S.W.3d at 637. The evidence

allowed the jury to conclude Garcia acted deliberately, which supports the jury's inference that he acted with the requisite intent or knowledge to kill. The facts allowed the jury to conclude that (1) Garcia and his cousin were angry about a drug deal and beat two victims they kidnapped in an attempt to locate the individual they believed ripped them off, (2) they drove around looking for the supposed thief, (3) video from the store showed two shooters in dark clothing walking up to the vehicle, and (4) between the two of them, they fired eighteen shots from close range into a car. As reasonable factfinders, the evidence allowed the jury to conclude Garcia acted knowingly or with intent to kill. *See id.* We overrule issues two and three.

Following the close of the State's evidence, the defense moved for a directed verdict, which the trial court denied. A directed verdict is a challenge to the sufficiency of the evidence, which we review under the *Jackson* standard in the light most favorable to the verdict to determine if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *See Canales v. State*, 98 S.W.3d 690, 693 (citing *Jackson*, 443 U.S. at 307; *Butler v. State*, 769 S.W.2d 234, 239 (Tex. Crim. App. 1989)). Based on our determination in issues one through three that the evidence was sufficient to establish Garcia knowingly or intentionally caused Bolton's death and viewing all the evidence in the light most favorable to the

45

verdict against a hypothetically correct charge, we conclude the trial court did not err in overruling Garcia's motion for a directed verdict. We overrule issue four.

**B. Issues Five through Seven: Hearsay**

In issues five through seven, Garcia complains the trial court abused its discretion by allowing witnesses Natalie Castillo, Kristina Sanchez, and Diego Torres to testify about statements made by co-defendant Kristopher Garcia. We review a trial court's ruling on the admissibility of evidence for abuse of discretion. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006) (citing *Zuliani v. State*, 97 S.W.3d 589, 595–96 (Tex. Crim. App. 2003)). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Howell v. State*, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005) (citations omitted).

Kristopher Garcia, who Garcia characterizes as a "co-defendant," did not testify at trial. The three witnesses Garcia complains of testified about statements Kristopher made the night of the murder. Garcia objected to the statements of each of the three witnesses, and the trial court conducted a lengthy hearing outside the jury's presence to determine whether the three witnesses could testify before the jury about Kristopher's statements. During the hearing, the three witnesses testified about the circumstances under which Kristopher made the statements at issue. Natalie and Kristina each testified that Kristopher told them "we got him" after Kristopher and

46

Garcia returned late that evening. Diego, who was in the vehicle with Garcia and Kristopher immediately before and after Bolton's murder, testified he heard Garcia and Kristopher speaking back and forth asking if the guns and ammunition were ready, and when Kristopher and Garcia re-entered the vehicle, he heard them make statements that they got him and that they shot directly into the car.

Hearsay is defined as a statement made by the declarant not while testifying at the current trial and a party offers it to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Hearsay statements are generally inadmissible. *See* Tex. R. Evid. 802. Statements against penal interest are an exception to the hearsay rule. *See* Tex. R. Evid. 803(24). Statements against penal interest can incriminate the person making the statement as well as third parties, including co-defendants. *Dewberry*, 4 S.W.3d at 751. For such statements to be admissible, two requirements must be met: (1) the trial court must determine if the statement subjects the declarant to criminal liability and whether the declarant realized that; and (2) the court must determine there are sufficient corroborating circumstances to indicate the statement is trustworthy. Tex. R. Evid. 803(24); *Walter v. State*, 267 S.W.3d 883, 890–91 (Tex. Crim. App. 2008).

After the hearing, the trial court ruled the statements admissible, citing the *Dewberry* and *Fratta* cases in support of its decision. *See Dewberry*, 4 S.W.3d at

47

735; *Fratta v. State*, No. AP–76,188, 2011 WL 4582498 (Tex. Crim. App. Oct. 5, 2011) (mem. op., not designated for publication) (generally discussing the admissibility of blame-sharing versus blame-shifting statements and non-testimonial statements). The trial court determined Kristopher's statements were non-testimonial in nature, were blame-sharing, and were sufficiently corroborated. We cannot say that the trial court acted without reference to any guiding rules or principles when it decided the testimony was admissible. *Howell*, 175 S.W.3d at 792. Thus, we conclude the trial court did not abuse its discretion in admitting the statements in question.

Issues five through seven are overruled.

## C. Issue Eight: Jury Charge

In his eighth issue, Garcia argues the jury charge was so misleading that it caused him egregious harm, as it failed to properly charge the jury regarding accomplice witness testimony. At the charge conference, when asked by the trial court whether there were any additions or objections to the proposed charge, the defense conveyed it had none. A trial court is required to submit a charge to the jury containing the law applicable to the case. Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). Upon a finding of error in the court's charge, there are different standards of review employed depending on whether a party timely objected.

48

*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). When, as here, a party fails to object to the jury charge, "reversal is required only if the error was so egregious and created such harm that the defendant did not have a fair and impartial trial." *See Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016) (citing *Almanza*, 686 S.W.2d at 171). Jury charge error results in egregious harm if it "affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007) (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996); *Almanza*, 686 S.W.2d at 172; *Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim. App. 2005)). To determine whether jury charge error is egregiously harmful, we consider the entirety of the charge, the evidence, arguments of counsel, and other relevant information in the trial record as a whole. *Id.* (citation omitted); *Ngo*, 175 S.W.3d at 750 n.48; *Almanza*, 686 S.W.2d at 171.

A witness is an accomplice as a matter of law in the following circumstances: (1) the witness has been charged with the same offense as the defendant or a lesser-included offense; (2) the State charges the witness with the same or lesser-included offense as the defendant but dismisses the charges in exchange for the witness's testimony against the defendant; and (3) when the evidence is uncontradicted or so

one-sided that a reasonable juror could only conclude the witness was an accomplice. *Ash v. State*, 533 S.W.3d 878, 886 (Tex. Crim. App. 2017).

Here, comments made during voir dire revealed that Kristopher had already been convicted and sentenced to sixty years for Bolton's murder. We conclude the charge the trial court gave the jury should have included an instruction explaining that Kristopher was an accomplice witness as a matter of law rather than an accomplice as a matter of fact. That said, when examining the entirety of the charge, the evidence, the arguments of counsel, and the record as a whole, we also determine Garcia was not egregiously harmed by the error in the charge. *See Stuhler*, 218 S.W.3d at 719; *Ngo*, 175 S.W.3d at 750 n.48; *Almanza*, 686 S.W.2d at 171. Had the trial court instructed the jury that Kristopher was an accomplice as a matter of law, the jury would have known that Kristopher's statements needed to be corroborated. In contrast, the instruction he was an accomplice as a matter of fact informed the jury that Kristopher's statements required corroboration only if the jury first determined he was an accomplice.

"[N]on-accomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve." *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). Kristopher's statements incriminated himself and Garcia; however,

50

witness Diego Torres overheard Garcia making similar statements that incriminated him for Bolton's murder. When Kristopher and Garcia returned to the truck after firing into Bolton's car, Diego testified he overheard them both saying, "I got him, I got him." Also, right before the shooting, Diego overheard Garcia and Kristopher discussing whether their guns and ammunition were ready. Finally, there is evidence corroborating the statements Kristopher and Garcia made incriminating them both for Bolton's murder. On this record, we cannot conclude Garcia was egregiously harmed by the trial court's charge error. We overrule issue eight.

## V. Conclusion

We conclude the evidence was legally sufficient to support the jury's verdict of guilty for the offense of murder under a party theory of liability. The non-accomplice testimony and evidence tends to connect Garcia to the offense. We also determine the trial court did not abuse its discretion by allowing certain witnesses to testify as to Kristopher's statements. Finally, Garcia failed to show how he was egregiously harmed by the jury charge. For these reasons, we affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

51

Submitted on October 2, 2018
Opinion Delivered June 26, 2019
Publish

Before McKeithen, C.J., Kreger, and Horton, JJ.