**Affirm and Opinion Filed July 6, 2022**



**In the**

**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00866-CR**

**ADRIAN ALEXANDREW CASTILLEJA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. F17-76547-H**

## MEMORANDUM OPINION

Before Justices Myers, Carlyle, and Goldstein
Opinion by Justice Carlyle

Following appellant Adrian Alexandrew Castilleja's not-guilty plea, a jury convicted him of murder and assessed punishment at life imprisonment and a $10,000 fine. In nine issues, he asserts evidentiary sufficiency and admissibility challenges, jury charge error, erroneous denial of his motions for recusal, mistrial, and new trial, and improper lack of a hearing on his recusal motion. We affirm in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

### Background

The indictment in this case alleged Mr. Castilleja (1) "intentionally and knowingly" caused the death of Jean Carlo Casiano-Torres (Rico) by shooting him with a firearm and (2) "intend[ed] to cause serious bodily injury to [Rico]," "commit[ed] an act clearly dangerous to human life" by shooting Rico with a firearm, and thereby caused Rico's death. On the first day of trial, Mr. Castilleja filed a motion to recuse the trial court judge, which was denied.

At trial, Gabrielle Balderaz testified that on October 11, 2017, she was a waitress at XTC Cabaret, a Dallas strip club. Rico was an occasional customer and a friend. About fifteen minutes after the club's 5 a.m. closing time, she went to her friend Chris's car in the club's parking lot to get her phone. Rico and another XTC Cabaret waitress, Star Nguyen, were in Ms. Nguyen's car next to Chris's, waiting for Ms. Balderaz because they were planning to go eat. Ms. Balderaz heard gunshots close by and got out of Chris's car "to see what was going on." She did not know where the gunshots came from. Then, Ms. Balderaz saw Rico bleeding in Ms. Nguyen's car and realized he had been shot. He said "they got me." Ms. Balderaz called 911.

Ms. Balderaz later learned a video surveillance camera had recorded the incident and she saw video of the shooting "on social media and on the news." The State offered into evidence State's Exhibit 4, a disk containing a video recording. Ms. Balderaz stated she recognized the disk as "the footage of the actual shooting."

–2–

Over defense counsel's objection, State's Exhibit 4 was admitted into evidence and published to the jury.

Ms. Balderaz testified she had viewed that video recording previously and it showed the shooting in question. As the jury watched the video, she described what was happening. In the video, a white car came into the frame and slowed down as it passed Ms. Nguyen's car. A few minutes later, the same white car stopped near Ms. Nguyen's car. A person approached Ms. Nguyen's car and knocked on the car's window. Rico opened the door and the person shot him. Ms. Balderaz stated the video showed the shooter was wearing a blue shirt and a hat.

Star Nguyen testified that on the night of the shooting, she worked an eight-hour shift as a waitress at XTC Cabaret. Rico was a repeat customer who had become a friend. When her shift ended at 5 a.m., Rico asked her to give him a ride to a nearby Whataburger. She agreed because it was on the way to the restaurant where she and Ms. Balderaz planned to go eat. Rico got into the passenger seat of Ms. Nguyen's car, a white Mercedes Benz. They drove to the back of the club and waited while Ms. Balderaz retrieved her phone from a friend in a parked car next to them. While Ms. Nguyen was sitting in the driver's seat of her car with Rico next to her, "a shooting happened." She testified she did not immediately realize there had been gunshots. She "just heard a lot of ringing in my ears" and "thought somebody hit my car." Then, she looked over at Rico and saw he was bleeding. She "hopped out" of

–3–

the car and called to Ms. Balderaz for help. Ms. Balderaz called 911. Ms. Nguyen did not see who had shot into the car.

Ms. Nguyen stated she had served Rico drinks at the club earlier that night. He was with two people he said were his cousins. At the time of the shooting, those two people were not around. She did not see Rico with anyone else at the club that night except club dancers.

Ms. Nguyen later watched a video recording of the shooting at the district attorney's office. She stated that though she could not see the shooter's face in the video, she "saw his outfit." He was wearing a blue shirt, "saggy jeans," and a hat. He "looked skinny." The State replayed portions of State's Exhibit 4 during her testimony.

She stated that after seeing the shooter in the video recording, she told police she had seen someone "with that outfit" in the club on the night of the shooting. He was with "a group of guys," one of whom was Mr. Castilleja, an occasional customer she had met previously. She did not know the shooter or any of the other men in the group.

Timothy St. Onge, XTC Cabaret's assistant general manager, testified he was inside the club "closing out" when the shooting occurred and did not learn of it until after police and paramedics arrived. He stated that earlier, at about 5:01 a.m., he was closing out the register at the main bar and heard the "cocking of a handgun." He looked up and saw a customer walking toward the front door while putting a gun

"back in the waistband of his pants." Mr. St. Onge was concerned because "[a]ll patrons are subject to be searched upon entering" and "there should be no firearms inside the building." Though Mr. St. Onge told a security guard to "go get him," the guard did not reach the armed man before he left the building. The man got into the passenger seat of a white Cadillac in front of the building and the car drove away. Mr. St. Onge testified he recognized the armed man as a regular customer referred to as "Ace" whom he had seen at the club multiple times. He identified "Ace" as Mr. Castilleja.

Mr. St. Onge testified that after he was told a shooting had occurred, he reviewed the club's surveillance video footage regarding what he had seen. He stated, "I had learned that the shooter was also in that white Cadillac and that after they exited the parking lot, they looped around and came right back into the main entrance, and then they pulled up behind the victim. And the shooter got out of that white Cadillac and then proceeded to shoot the victim." Mr. St. Onge stated the club's interior video footage showed that as Mr. Castilleja walked toward the front door at closing time, he "pulled out" the gun, cocked it, and stuck it "back into the front waistband of his pants." In the video, Mr. St. Onge could see the gun clearly in the reflection of a mirrored column next to Mr. Castilleja. He notified his supervisor of what he had seen.

The State offered into evidence State's Exhibit 14, another disk containing a video recording. Over defense counsel's objection, State's Exhibit 14 was admitted

into evidence and published to the jury. Mr. St. Onge stated it was a cell-phone video recording of the club's inside surveillance video from the night of the shooting. He described what it showed as it was played for the jury. He stated that at one point in the video, Rico walked toward Mr. Castilleja and said something to him, then walked past him. Then, Mr. Castilleja walked "just behind" Rico toward the front door, during which time the above-described gun-cocking incident occurred.

Mr. St. Onge testified he also reviewed footage from the club's other video cameras that night. He stated the footage showed that about five minutes prior to the gun-cocking incident, Mr. Castilleja had been outside the club. The white Cadillac had pulled through the valet driveway in front of the club and stopped. Mr. Castilleja "approached the driver's window" and there was "some kind of exchange." Then, Mr. Castilleja walked back into the club. Mr. St. Onge stated that though the club requires its security guards to search customers each time they enter the building, the video showed the guards did not search Mr. Castilleja at that time.

XTC Cabaret's security manager, Donny Smith, testified that at the time of the shooting he was locking the club's doors from the inside. He heard several gunshots outside and immediately unlocked the doors and went out of the building. A man told him "that guy just got shot" and pointed toward the valet parking lot. Mr. Smith saw a white Cadillac "speeding off towards the valet exit on the service road" and saw a white Mercedes Benz in the parking lot with a door open. When he reached

the Mercedes Benz, he saw that a man he recognized as a regular customer had been shot several times. He called 911.

Mr. Smith stated the club has at least fifteen to twenty video surveillance cameras inside and outside. The State offered into evidence State's Exhibits 16 and 16B, a flash drive and video disk respectively. Mr. Smith testified he had reviewed those exhibits and they contained several hours of the club's video surveillance footage from before and after the shooting. State's Exhibit 16B consisted of "video clips that were pulled from State's Exhibit 16." Over defense counsel's objection, those exhibits were admitted into evidence and State's Exhibit 16B was published to the jury. Additionally, fourteen screenshots from State's Exhibit 16B were admitted into evidence without objection and published to the jury.

State's Exhibit 16B showed the shooter standing near the club's front entrance shortly after midnight with Mr. Castilleja. Mr. Smith testified it appeared from the video that they knew each other. The shooter left the club at 3:45 a.m. At about 4:26 a.m., a white Cadillac drove into the club's parking lot. A few minutes later, the Cadillac drove to the club's front valet area, where Mr. Castilleja was standing. Mr. Castilleja approached the driver's window, appeared to speak with the driver, then walked back toward the club's front door "holding onto" his "front waist area." He went into the club without being searched. The Cadillac drove away from the club's entrance and parked nearby outside the surveillance cameras' range. At 5 a.m., Mr.

Castilleja came out of the club's front door and walked toward where the white Cadillac had parked.

Mr. Smith testified he followed Mr. Castilleja out of the club at that point because Mr. St. Onge had reported he had a gun. Mr. Smith saw Mr. Castilleja get into the Cadillac's front passenger seat and place something on the floor. He stated the shooter was in the Cadillac's driver's seat. The video showed that the Cadillac drove away, then returned just before the shooting.

Dezaray Raitt testified she was working as a dancer at XTC Cabaret on the night of the shooting. A friend introduced her to Mr. Castilleja earlier that evening and she sat with him the whole night. He seemed "pretty calm." They drank Crown Royal whiskey directly out of the bottle so she was not sure how much alcohol he consumed. When Ms. Raitt left the table at about 4:30 or 4:45 a.m., there was one other person sitting with Mr. Castilleja. That person was tall and skinny with saggy pants, a big jacket, and glasses.

Ms. Raitt left the club at about 5 a.m. She rode in a friend's car to a nearby Whataburger. Ms. Raitt testified that as she was talking on her cell phone in her friend's car at the Whataburger, she saw a black car next to them with the window down. She glanced into that car and saw Mr. Castilleja in the driver's seat and "his friend, the same guy that was inside of the club with him that night" in the passenger seat. Mr. Castilleja "was very upset, mad, agitated." She heard him say, "Fuck them, niggas. I'm going back." She turned to her friend and asked "[w]hat did he say"

because she "wanted to make sure what I heard was right." Her friend had heard the same statement. Ms. Raitt and her friend got their food and went home. Ms. Raitt learned of the shooting the next day.

Detective Chris Walton of the Dallas Police Department's homicide unit was assigned to investigate the shooting. When he responded to the scene, he "gathered that there was a disturbance that occurred inside of the club and that was—that was related to the shooting that occurred outside." By tracing the white Cadillac's license plate, he learned the shooter was Rene Carrillo. He also learned Mr. Castilleja had arrived at the club at the same time as Rene Carrillo. He stated the video surveillance footage showed that at closing time, Mr. Castilleja and Rico "had an exchange of words" and when Mr. Castilleja cocked the gun, "the victim in the video, he looked back to see what was going on." Based on the investigation, Mr. Castilleja was "a person of interest." Detective Walton "utilize[d] the information we received in our database to try to contact him through family," but did not "get any response."

Dallas police detective Barrett K. Nelson testified he is a member of the United States Marshals Task Force, which specializes in locating and arresting fugitives. Detective Walton contacted him to help find Mr. Castilleja. Detective Nelson reached out to his Dallas-area informants, obtained a local apartment address, and arrested Mr. Castilleja. Police found Rene Carrillo at the same apartment and also took him into custody. Police collected both men's cell phones.

Though no information could be extracted from Mr. Castilleja's locked phone, police were able to extract contacts and phone numbers from Rene Carrillo's phone.

Records custodians for Sprint and T-Mobile cell phone companies testified regarding call records from the date of the shooting, which were admitted into evidence without objection. The call records showed that between 4 a.m. and 4:30 a.m., there were multiple calls back and forth between a device assigned to an account in Mr. Castilleja's name and a device assigned to an account in Rene Carrillo's name. The records also showed the approximate locations where those calls originated, which were in the club's vicinity.

Michael Fegely testified he works for ZetX, which has a software product that maps cell phone data. At the State's request, he used that software to map the cell phone records related to this case. The resulting map was introduced into evidence without objection.

Dr. Tracy Dyer, deputy chief medical examiner for the Dallas County Medical Examiner's Office, testified she supervised the autopsy of Rico's body. She identified eight gunshot wounds. His date of death was October 11, 2017, and his cause of death was "gunshot wounds to the trunk." Dr. Dyer stated his wounds were "serious bodily injuries" and shooting a person with a gun constituted "an act clearly dangerous to human life."

The charge of the court stated in relevant part:

## MENTAL STATE DEFINITIONS

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

## PARTY LIABILITY

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another of which he is criminally responsible, or by both. A person is criminally responsible for the offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

You are instructed that you may consider all relevant facts and circumstances surrounding the death, if any, and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense, if any.

## APPLICATION PARAGRAPHS

Now bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about the 11th day of October, 2017, in Dallas County, Texas, the defendant, ADRIAN ALEXANDREW CASTILLEJA, did unlawfully then and there, intentionally or knowingly cause the death of JEAN CARLO CASIANO TORRES, an individual, hereinafter called deceased, by shooting JEAN CARLO CASIANO TORRES with a firearm, a deadly weapon, then you will find the defendant guilty of murder, as charged in the indictment.
Or

If you find from the evidence beyond a reasonable doubt that on or about 11th day of October, 2017, in Dallas County, Texas the defendant, ADRIAN ALEXANDREW CASTILLEJA, did unlawfully did then and there intend to cause serious bodily injury to JEAN

–11–

CARLO CASIANO TORRES, an individual, hereinafter called deceased, and did then and there commit an act clearly dangerous to human life, namely shooting JEAN CARLO CASIANO TORRES with a firearm, a deadly weapon, then you will find the defendant guilty of murder, as charged in the indictment.

If you have a reasonable doubt as to whether the defendant is guilty of any offense defined in this charge, then you will acquit the defendant and say by your verdict "not guilty."

After the jury retired to deliberate, defense counsel moved for a directed verdict on the ground that "[t]he only theory of liability contained in the application paragraphs would be defined [sic] the defendant guilty if he himself personally was the shooter" and "[t]here is no application paragraph that would allow for a finding of him guilty as a party." The trial court denied that motion.

Following his conviction and sentencing, Mr. Castilleja filed a motion for new trial based on the lack of a hearing on his recusal motion and the recusal motion's denial. After a hearing, the trial court denied the motion for new trial.

## Sufficiency of the evidence

In assessing the sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the offense's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We defer to the factfinder to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Jackson*, 443 U.S. at 319; *Merritt v. State*, 368 S.W.3d

–12–

516, 525 (Tex. Crim. App. 2012). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

A reviewing court measures the evidence by the elements of the offense as defined by the hypothetically correct jury charge rather than the charge actually given. *E.g.*, *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020); *Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex. Crim. App. 2018). The hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Ramjattansingh*, 548 S.W.3d at 546 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

A person commits murder if he intentionally or knowingly causes the death of an individual or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE § 19.02(b). Murder is a "result of conduct" offense, which means "the culpable mental state relates to the result of the conduct, i.e., the causing of the death." *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE § 6.03(a). A person acts knowingly

–13–

with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id*. § 6.03(b).

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for whom he is criminally responsible, or by both. *Id*. § 7.01(a). Each party to an offense may be charged with commission of the offense. *Id*. § 7.01(b). A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id*. § 7.02(a)(2).

To determine whether an individual is a party to an offense, we look to "events before, during, and after the commission of the offense." *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex. Crim. App. 1977). We also look to circumstantial evidence to prove party status. *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). There must be sufficient evidence of an understanding and common design to commit the offense. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Each fact need not point directly to the guilt of the defendant, as long as the cumulative effect of the facts is sufficient to support the conviction under the law of parties. *Id*. Mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012).

In his first issue, Mr. Castilleja asserts the evidence is legally insufficient to support his conviction. He contends (1) the jury charge's application paragraph "only authorized the jury to find the Appellant guilty as the principal actor and did not authorize a finding of guilt under the law of parties" and (2) "there was no evidence presented by the State proving guilt as the primary actor as alleged in Appellant's indictment and the application paragraph." In the alternative, he contends "the evidence was insufficient, even under the law of parties, in that the evidence at best only placed the Appellant at the scene earlier in the night and showed that he was friends with [Rene Carrillo] and may have possessed a gun earlier that morning."

Though the jury charge's application paragraphs did not expressly mention party liability, we measure the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Walker*, 594 S.W.3d at 335; *Ramjattansingh*, 548 S.W.3d at 546. From the trial's outset, the State tried this case under a party theory of liability. During opening statements, the prosecutor stated:

> [T]his is not the defendant who shot [Rico]. This is not him. In fact, what you're going to find out, that in the course of investigation, it was an individual by the name of Rene Carrillo. But even though the defendant, Adrian Castilleja, didn't pull the trigger, what you're going to learn throughout this trial is that he's the whole reason [Rico] was killed. . . . . And we're going to ask for a guilty verdict because [Mr. Castilleja] was a party to this offense.

During trial, the State presented a video recording of a person other than Mr. Castilleja committing the shooting and undisputed testimony that the shooter was Rene Carrillo. On this record, we conclude a hypothetically correct jury charge

–15–

would have applied the law of parties to the facts of the case in the application portion. *See Ramjattansingh*, 548 S.W.3d at 546; *see also Garcia v. State*, 578 S.W.3d 106, 124–25 (Tex. App.—Beaumont 2019, pet. ref'd) (concluding that where State charged defendant with murder and tried case under party theory of liability not submitted to jury, hypothetically correct charge would have included law-of-parties instruction and thus scope of sufficiency analysis included party liability); *Howard v. State*, 966 S.W.2d 821, 825 (Tex. App.—Austin 1998, pet. ref'd) (concluding jury charge's failure to expressly authorize defendant's conviction as party did not require appellate court to disregard law of parties in reviewing sufficiency of evidence to sustain his murder conviction, where evidence raised party liability theory and jury charge included general instruction on law of parties).

As to sufficiency under the law of parties, Mr. Castilleja argues (1) "[t]he jury was asked to speculate about any relationship or altercation between the Appellant and the deceased" and (2) "there was insufficient proof to show that Appellant's conscious objective or desire was for [Rene Carrillo] to commit the murder of Rico or that Appellant had any intent to assist or promote which was contemporaneous with or before the murder." We disagree. A reasonable jury could infer from the evidence described above that in the hour before the club closed, Mr. Castilleja communicated by cell phone with Rene Carrillo; approached a white Cadillac in front of the club and brought a gun from that car into the club; had an encounter or interaction with Rico in the club and wanted him to hear the gun being cocked; left

–16–

the club with the gun in his waistband and got into the white Cadillac, which Rene Carrillo was driving; and returned to the club a short time later, angry or upset. The video shows Rene Carrillo got out of the white Cadillac with a gun and shot Rico multiple times. On this record, we conclude the direct and circumstantial evidence is sufficient to support a murder conviction under the law of parties. *See Guevara*, 152 S.W.3d at 49; *see also Cordova*, 698 S.W.2d at 112 ("A jury may find the specific intent to kill from the circumstances accompanying the use of the weapon.").

**Jury charge error**

If a jury charge contains error, the appellate court evaluates whether sufficient harm resulted from the error to require reversal. *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013). This is a difficult standard to meet and requires a showing that the defendant was "deprived of a fair and impartial trial." *Id*. The record must disclose "actual rather than theoretical harm" and the error must have affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory. *Id*. "In determining whether egregious harm is shown, we look at the entire jury charge, the state of the evidence (including the contested issues and the weight of probative evidence), the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Id*.

In his second and third issues, appellant contends the trial court (1) "erred and harmed the appellant by not including the law of parties in the [jury charge's] application paragraph" and (2) "erred in that the second application paragraph for manner and means of murder did not contain the words 'cause the death of Jean Carlo Casiano Torres' which was an element of the offense."

The record shows, and the State concedes, that both omissions constituted jury charge error. *See Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *Vasquez v. State*, 389 S.W.3d 361, 367–68 (Tex. Crim. App. 2012). But the State contends the omissions did not result in sufficient harm to require reversal. Because the record does not show Mr. Castilleja preserved his jury charge complaints in the trial court, we apply the egregious harm standard.

In considering the entire jury charge, we "ask whether anything in the balance of the jury charge either exacerbated or ameliorated th[e] error." *French v. State*, 563 S.W.3d 228, 236 (Tex. Crim. App. 2018). Here, the charge correctly set out the law of parties in a section titled "Party Liability" that immediately preceded the application paragraphs. The first sentence of the charge's application portion stated "bearing in mind the foregoing instructions." The charge's "Concluding Instructions" instructed the jury that they "are bound to receive and to follow the law from the Court." Thus, the charge's other provisions ameliorated the law-of-parties omission in the application portion.

As to the "cause the death" element's omission in the second application paragraph, the charge's abstract portion stated Mr. Castilleja was charged with murdering Rico and "[a] person commits the offense of murder if he intentionally or knowingly causes the death of an individual; or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Additionally, the first application paragraph contained the "cause the death" element. Thus, the charge as a whole ameliorated that error.

Mr. Castilleja argues the complained-of errors were "exacerbated by the trial court's additional error in not limiting the definition of knowingly to result of the conduct," which made the charge "misleading." We disagree. Though the jury charge's definition of "knowingly" was overbroad for charged offense, the only reference to a "knowing" mental state in the first application paragraph properly required the jury to find beyond a reasonable doubt that Mr. Castilleja intentionally or knowingly caused Rico's death. *See Peterson v. State*, 836 S.W.2d 760, 765–66 (Tex. App.—El Paso 1992, pet. ref'd). The term "knowingly" did not apply to the second application paragraph.

Next, we consider the state of the evidence, arguments of counsel, and any other relevant information. *Nava*, 415 S.W.3d at 298. Here, the only theory advanced and argued by the State was that Mr. Castilleja was a party to the offense of murder, and the evidence described above sufficiently supported that theory. Uncontroverted evidence showed Rico died as a result of the shooting in question. During closing,

–19–

the State read the jury the first paragraph of the charge's party liability instruction, stated "we know Rene Carrillo was the shooter," and again argued that Mr. Castilleja acted as a party. Defense counsel stated at closing, "[W]hen you look through the charge, you'll see—first off, to hold somebody guilty as an accomplice or a party, it has to be that individual's intent for the other to commit the crime." Additionally, during voir dire, both sides explained the law of parties to the jury.

The charge errors here are obvious, and should have been obvious to every lawyer at the trial, as well as to the judge. But they are not so dramatic as to have misled the jury, or to have otherwise clouded, distracted, or modified jurors' attention away from the legal theories and facts presented to them. On this record, we cannot conclude these jury charge errors resulted in egregious harm. *See id*.; *see also Starks v. State*, No. 05-14-00191-CR, 2015 WL 1955684, at *3–4 (Tex. App.—Dallas May 1, 2015, pet. ref'd) (mem. op., not designated for publication) (no egregious harm in omitting party liability language from application paragraph where, in light of entire record, charge was not misleading).

### Denial of recusal hearing and recusal-related motions

We review denials of motions to recuse and motions for new trial under an abuse of discretion standard. *See* TEX. R. CIV. P. 18a(j)(1)(A); *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012); *see also Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) ("A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules or principles.").

We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). "The trial court, as factfinder, is the sole judge of witness credibility at a hearing on a motion for new trial with respect to both live testimony and affidavits." *Okonkwo v. State*, 398 S.W.3d 689, 695 (Tex. Crim. App. 2013). "[A] trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling." *Webb*, 232 S.W.3d at 112.

Texas Rules of Civil Procedure 18a and 18b govern recusal of judges. TEX. R. CIV. P. 18a, 18b. A motion to recuse "must be filed as soon as practicable after the movant knows of the ground stated in the motion." *Id*. 18a(b)(1)(A). Additionally, Rule 18a provides that a recusal motion (1) must not be filed after the tenth day before the date set for trial "unless, before that day, the movant neither knew nor reasonably should have known . . . that the judge whose recusal is sought would preside at the trial or hearing"; (2) must assert one or more of the grounds listed in Rule 18b; (3) must not be based solely on the judge's rulings in the case; and (4) must "state with detail and particularity facts that (A) are within the affiant's personal knowledge, . . . (B) would be admissible in evidence; and (C) if proven, would be sufficient to justify recusal." *Id*. 18a(a)–(b). Rule 18b states in part that a judge must recuse in any proceeding in which the judge's impartiality might reasonably be

questioned or in which the judge "has a personal bias or prejudice concerning the subject matter or a party." *Id*. 18b(b)(1)–(2).

Within three days of when a motion to recuse is filed, the respondent judge must either sign an order of recusal or sign an order referring the motion to the regional presiding judge. *Id*. 18a(f)(1). The regional presiding judge must rule on a referred motion or assign a judge to rule. *Id*. 18a(g)(1). A motion to recuse that does not comply with Rule 18a may be denied without an oral hearing. *Id*. 18a(g)(3)(A). The order must state the nature of the noncompliance. *Id*.

In his fourth and fifth issues, Mr. Castilleja asserts the trial court erred by (1) failing to conduct a hearing on his motion to recuse the trial court judge, (2) denying the recusal motion, and (3) denying his motion for new trial that was based on lack of a recusal hearing and denial of his motion to recuse. We address these issues together.

The record shows that after Mr. Castilleja's 2017 indictment for murder, this case was assigned to the 283rd Judicial District Court of Dallas County. Trial was set for Monday, February 10, 2020. On that date, the case was transferred to Dallas County Criminal District Court No. 1, where Judge Michael Snipes was sitting as a visiting judge. Judge Snipes had recently presided over the murder trial of Rene Carrillo based on these same events.

On the morning of February 10, 2020, Judge Snipes called the case and asked if the parties were ready. Mr. Castilleja's counsel stated he was not. He stated he

believed Criminal District Court No. 1 lacked jurisdiction because the case was currently assigned to the 283rd Judicial District Court. Judge Snipes told him, "The case has been properly transferred to this court. I checked on that." Defense counsel stated he would be filing a motion to recuse Judge Snipes. At that point, Judge Snipes recessed the proceedings.

An hour later, during the recess, the parties appeared before the 283rd Judicial District Court with Judge Lela Lawrence Mays presiding. Defense counsel asserted the case had been transferred "unbeknownst to him." He stated:

> [I]f there is an effort to try this case in front of the Honorable Judge Snipes, then we will be filing an emergency motion for recusal, because we have previously found Judge Snipes' conduct and rulings to be so outside the norm and so unfairly prejudicial and improper to the Defense that we do not feel that we can get a fair trial in front of him.

The State responded that a recusal motion at that point would be untimely and that Judge Snipes "hear[d] the first trial involving the co-defendant and made rulings that were within the proper conduits of the statute and the law."

Judge Mays stated that the case had been "transferred to CDC No. 1 with Judge Snipes sitting." Then, the following exchange took place between Judge Mays and defense counsel:

> THE COURT: . . . But let me tell you what, to kind of give you a little history on it. I understand that you are the new lawyer that's on the case, but the co-defendant was heard by Judge Snipes. It has always been the case that we were trying to get Judge Snipes to hear [this] case.
>      The issue was whether or not we had a courtroom. So now that we have a courtroom . . . that was the reason why we were moving it, because he did hear the co-defendant.

–23–

[DEFENSE COUNSEL]: I understand, Judge, and if anyone—and if the Court had told me about that, then we could have addressed the issue at that time.

But we have—our position has always been that Judge Snipes— we would object vehemently if there's any effort to put this case in front of Judge Snipes.

And walking in here this morning and being told at 8:30 this morning this has happened is shocking to me.

THE COURT: Okay. Your assistant was told on Friday.

[DEFENSE COUNSEL]: No, Judge, she was not.

THE COURT: Well, there was a discussion regarding—with your assistant on Friday.

[DEFENSE COUNSEL]: That's right.

THE COURT: I was not here Friday, but there was a discussion where I know that—I knew that you were going to be bringing an objection this morning.

Judge Mays stated that Judge Snipes was going to hear the case. Defense counsel stated he was "sitting down and preparing an emergency motion for recusal."

About an hour later, the proceedings in Criminal District Court No. 1 resumed. Judge Snipes stated, "The Defense has indicated that they intend to file a motion to recuse in this case. That case—that motion has not been filed as of this exact moment. . . . I have before me a Forvus sheet indicating that this case has been transferred from 283rd into this court."[1] The trial court stated that the "Forvus sheet" would be included in the reporter's record as Exhibit 1. Mr. Castilleja objected to the

---

[1] "Forvus" is an electronic data system used by Dallas County courts.

–24–

trial court's jurisdiction and to the proceedings "moving forward" before Judge Snipes. The trial court overruled those objections and proceeded with arraignment and jury selection.

At 2:46 that afternoon, the defense filed a verified motion to recuse Judge Snipes. The motion alleged, "The rulings made by Judge Snipes in the trial of co-defendant Rene Carrillo and the rulings made by Judge Snipes in the last trial that defense counsel tried before him cause defense counsel to believe that Judge Snipes cannot fairly and impartially preside over this case." Judge Snipes signed an order that same day declining to recuse himself and requesting that Judge Ray Wheless, Presiding Judge of the First Administrative Judicial Region, assign a judge to hear the motion to recuse. Judge Wheless signed an order later that day denying Mr. Castilleja's motion to recuse Judge Snipes.

After his conviction and sentencing, Mr. Castilleja filed a motion for new trial based on the lack of a hearing on his motion to recuse and the denial of the recusal motion. The attachments included an affidavit of Mr. Castilleja stating he "did not feel like Judge Snipes would be fair to [him]" at trial because Judge Snipes (1) had held his bond insufficient and ordered that he be taken into custody and jailed without bond when Rene Carrillo absconded during his June 2019 trial and (2) stated to Mr. Castilleja at that time "that when I get to prison I should avoid joining Tango Blast or any other prison gang," which made Mr. Castilleja "think that he already thought I was guilty." Additionally, at the hearing on the motion for new trial, the

–25–

trial court admitted into evidence affidavits of defense counsel and counsel's associate regarding the recusal motion's timeliness and Judge Snipes's complained-of statement and bond ruling. Following the hearing, the trial court denied the motion for new trial.

Mr. Castilleja's recusal arguments in his appellate brief begin with a section titled "Lack of Jurisdiction." He contends the trial court "lacked authority to preside over his case and sign the judgment because no valid order assigning the visiting judge to the trial court bench existed at the time [his] trial commenced." He argues he "objected to the defective assignment of Judge Snipes and same should have been granted as part and parcel with [his] motion to recuse." The record contains February 10, 2020 orders of transfer and receiving regarding this case and the Forvus sheet described by Judge Snipes. Also, both Judge Snipes and Judge Mays repeatedly stated on the first morning of trial that the case had been transferred. We cannot agree the record shows a "defective assignment" resulting in lack of jurisdiction.

Next, though the record does not show a recusal hearing, no oral hearing is required when a recusal motion does not comply with Rule 18a. *See id*. 18a(g)(3)(A). Here, Judge Mays stated to defense counsel that it had "always been the case that we were trying to get Judge Snipes to hear [this] case" and "there was a discussion" with defense counsel's associate on the Friday before trial "where I know that—I knew that you were going to be bringing an objection this morning." Thus, the record

supports a conclusion that the motion was not filed as soon as practicable after the movant knew of the ground stated in the motion. *See id*. 18a(b)(1)(A).

Moreover, the recusal motion's alleged basis was that "the rulings made by Judge Snipes in the trial of co-defendant Rene Carrillo and . . . in the last trial that defense counsel tried before him cause defense counsel to believe that Judge Snipes cannot fairly and impartially preside over this case." The record does not show the motion stated "with detail and particularity" facts that "would be sufficient to justify recusal." *Id*. 18a(a)(4); *see Fox v. Alberto*, 455 S.W.3d 659, 666 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("[I]f a party seeks recusal of a judge based on the judge's alleged bias, prejudice, or partiality and if that party does not show that the alleged bias, prejudice, or partiality arose from events occurring outside of judicial proceedings, then the judge may not be recused unless the judge has displayed a deep-seated favoritism or antagonism that would make fair judgment impossible." (citing *Liteky v. United States*, 510 U.S. 540, 550–51, 555–56 (1994))); *see also Amir-Sharif v. Tex. Dep't of Family & Protective Servs*., No. 05-13-00958-CV, 2015 WL 4967239, at *6 (Tex. App.—Dallas Aug. 20, 2015, pet. denied) (mem. op.) ("The requirement of an evidentiary hearing on a motion to recuse is not triggered unless the recusal motion states valid grounds for disqualification."). On

this record, we conclude the trial court did not err by not holding a hearing on Mr. Castilleja's recusal motion or by denying the motion to recuse.[2]

Mr. Castilleja contends his motion for new trial should have been granted because the evidence tendered with that motion showed Judge Snipes was biased against him and "had already formed the opinion that Appellant was guilty of the charged offense." He asserts "many of Judge Snipes's rulings also showed his bias against the Appellant," including the evidentiary rulings complained of in this appeal. He argues that "[b]ased upon all of the above, a reasonable person might question the trial judge's impartiality."

As described above, the trial court did not abuse its discretion by denying the recusal motion. To the extent Mr. Castilleja's affidavit described additional details of Judge Snipes's rulings that were not in the recusal motion, "[j]udicial rulings alone almost never constitute a valid basis for a motion to recuse based on bias or partiality" and "can only in the rarest circumstances evidence the degree of favoritism or antagonism required when no extrajudicial source is involved." *Liteky*, 510 U.S. at 555. Mr. Castilleja does not explain, and the record does not show, how the complained-of rulings demonstrated the required "deep-seated favoritism or antagonism that would make fair judgment impossible." *See id.* Additionally,

---

[2] To the extent Mr. Castilleja complains Judge Wheless's denial order did not adequately state the nature of the recusal motion's noncompliance, the record does not show that complaint was raised in the trial court. *See* TEX. R. APP. P. 33.1(a). Additionally, the record shows that prior to the recusal motion's filing, the matters of timeliness and the general insufficiency of a judge's non-specified rulings to support recusal were apparent from the proceedings on record. Thus, any alleged error regarding purported omissions in the order is harmless. *See* TEX. R. APP. P. 44.2.

"judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge" unless "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id*. The record does not show how Judge Snipes's purported statement that Mr. Castilleja should avoid joining a prison gang, made while Mr. Castilleja was waiting to be booked into jail, met that required standard. *Id*.; *see also Okonkwo*, 398 S.W.3d at 695. Because a reasonable view of the record supports denying Mr. Castilleja's motion for new trial, the trial court did not abuse its discretion. *See Webb*, 232 S.W.3d at 112.

## Admissibility of video evidence

In his sixth, seventh, and eighth issues, Mr. Castilleja contends the trial court erred by admitting certain video evidence—State's Exhibits 4, 14, 16, and 16B—over his "objection to lack of foundation." The record shows that when the State offered State's Exhibit 4 into evidence, defense counsel's objection was, "Object to that exhibit as the proper foundation has not been laid for such an exhibit." The defense's objection to State's Exhibit 14 was, "I'll object to State's 14 on lack of foundation." As to State's Exhibits 16 and 16B, which were offered together, defense counsel stated, "I object to the exhibits on lack of a proper foundation."

Though Mr. Castilleja argues on appeal that those exhibits should have been excluded based on Texas Rule of Evidence 901 ("Authenticating or Identifying Evidence"), his objections in the trial court did not specify that basis. Thus, his

admissibility complaints present nothing for this Court's review. *See* TEX. R. APP. P. 33.1(a)(1); *Bird v. State*, 692 S.W.2d 65, 70 (Tex. Crim. App. 1985) (stating that to preserve error for review, "counsel must inform the court just how the predicate is deficient"); *Edwards v. State*, 497 S.W.3d 147, 163, 164 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) ("[A]ppellant's objections of 'foundation' and 'improper foundation' were too general and not specific enough to advise the trial court of his complaint that the exhibits had not been properly authenticated as required by Texas Rule of Evidence 901."); *Pendley v. State*, No. 2-03-111-CR, 2004 WL 2712109, at *6 (Tex. App.—Fort Worth Nov. 24, 2004, pet. ref'd) (mem. op., not designated for publication) (concluding defendant's objection "that the proper foundation had not been laid" for admission of videotapes was "too general to apprise the trial court of his specific complaint" regarding authentication).

### Denial of motion for mistrial

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). We must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

A mistrial is an appropriate remedy in "extreme circumstances" for a narrow class of highly prejudicial and incurable errors. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). A mistrial is required only when the impropriety is clearly calculated to emotionally inflame the jurors' minds and is of such a character as to

suggest the impossibility of withdrawing the impression produced on the jurors' minds, or when the impropriety is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Williams v. State*, 417 S.W.3d 162, 175 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd).

Instructions to the jury are generally considered sufficient to cure improprieties that occur during trial, and we generally presume a jury follows the judge's instructions. *Id.* Thus, only in the most egregious cases where there is an "extremely inflammatory statement" is an instruction to disregard improper argument considered an insufficient response by the trial court. *Id.* Otherwise, the court of criminal appeals "has tended to find [a curative] instruction to have force." *Moore v. State*, 999 S.W.2d 385, 405 (Tex. Crim. App. 1999).

We balance three factors in determining whether the trial court abused its discretion by denying a motion for mistrial: (1) the severity of the conduct, (2) the curative measures taken by the trial court, and (3) the certainty of conviction absent the conduct. *Archie*, 340 S.W.3d at 739.

In his ninth issue, Mr. Castilleja contends the trial court erred by denying his motion for mistrial after Detective Walton "commented on Appellant's post-arrest silence." The record shows that during the State's direct examination of Detective Walton, the following exchange occurred:

> [PROSECUTOR]: And when [Mr. Castilleja] was arrested, did you do anything after—after the arrest?

–31–

[DETECTIVE WALTON]: As far as—are you talking about the investigation?

[PROSECUTOR]: Yeah, any—

[DETECTIVE WALTON]: I mean, he went to jail. I tried to—attempted to interview him which he refused to speak with me.

[PROSECUTOR]: Did you collect anything from him—

THE COURT: Let me see the lawyers up here.

At that point, the trial court excused the jury from the courtroom. The trial court stated to Detective Walton, "I know that you know you shouldn't have said that because it's a violation of [Mr. Castilleja's] Miranda rights." Then, the trial court asked defense counsel, "What do you propose to do?" Defense counsel objected to "the evidence that is now before the Court and the jury" and moved for a mistrial. Defense counsel stated:

> Judge, there are certain things that are so sacred that when the evidence is introduced as to those matters, the bell cannot be unrung. The—the—basically, the stink of the event cannot be cleared from the courtroom. Those include a comment on a defendant's invocation of his—the sacred Fifth Amendment right not to incriminate him or herself.
>
> . . . I believe that an instruction to the jury would be insufficient and the jury, of course, being a group of laypeople, they cannot exclude such a critical matter as is the comment as to a defendant's exercising his Fifth Amendment right.

Though the trial court stated it was "very deeply troubled by what just happened," it denied the motion for mistrial because "I don't believe it rises to that level." Then, defense counsel requested "that the Court instruct the jury to disregard

the witness's last answer and to not consider it for any purpose." When the jury members returned to the courtroom, the trial court instructed them as follows:

> Ladies and gentlemen of the jury, shortly before I asked you to step out of the courtroom, you may have heard an exchange between the Assistant District Attorney leading this case and the witness, Detective Walton, which ended up being, inadvertently, I believe, as far as the district attorney's case, but the witness said that he attempted to interview the defendant in this case and that he refused to be interviewed or words to that effect. That is an infringement of his Fifth Amendment rights and the jury will wholly disregard that took place. All right. You will wholly disregard it.

Mr. Castilleja contends the instruction to disregard "was ineffective and did not cure the prejudicial effect when considering the particular facts of this case." He argues the instruction "did not tell the jury that it could not consider it for any purpose but only stated that they should disregard it which was a confusing instruction to a lay jury." He also contends the State "made comments during closing which referenced back to the lack of cooperation by the Appellant," namely the prosecutor's statement, "You also heard Detective Walton talk about how you know when [Mr. Castilleja's] name came up, he reached out. He even spoke to family. They confirmed that was his number. He never got a response." Additionally, Mr. Castilleja asserts he received the "most severe punishment allowed." Thus, he argues, the facts "suggest the impossibility of the jury withdrawing the impression produced in their minds and it clearly was calculated to inflame the jury."

We begin by addressing the severity of the conduct. *See Archie*, 340 S.W.3d at 739. Though Detective Walton's comment on Mr. Castilleja's post-arrest silence

–33–

was improper, *see Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995), it was a single statement which the prosecutor did not specifically attempt to elicit. Mr. Castilleja's contention that the State's comments at closing "referenced back" to his right to remain silent are not supported by the record, as the State's comments at closing referenced Detective Walton's testimony about his attempt to contact Mr. Castilleja's family when he became a person of interest, not Mr. Castilleja's post-arrest silence.

As to the curative measures taken, the trial court promptly halted the proceedings, instructed the jury to "wholly disregard" the comment because it was an infringement of Mr. Castilleja's Fifth Amendment rights, then repeated, "You will wholly disregard it." Nothing in the instruction allowed the jury to consider the comment for any purpose, and we presume the jury followed the instruction. *See Williams*, 417 S.W.3d at 175. Only offensive and flagrant error warrants reversal when there has been an instruction to disregard. *Wesbrook v. State*, 29 S.W.3d 103, 116 (Tex. Crim. App. 2000). Here, nothing shows the comment was so flagrant that the instruction to disregard was ineffective. *See id*.

The third factor—certainty of conviction absent the misconduct—likewise indicates no abuse of discretion. As detailed in our sufficiency review above, the evidence supports the jury's guilty verdict. Additionally, to the extent Mr. Castilleja's punishment should be considered, the State presented evidence during the punishment phase showing Mr. Castilleja had committed several prior felonies and

was on probation for a felony offense at the time of the events in this case. On this record, we conclude the trial court did not abuse its discretion by denying Mr. Castilleja's motion for mistrial. *See Archie*, 221 S.W.3d at 699.

\*          \*          \*

We affirm the trial court's judgment.

/Cory L. Carlyle/
200866f.u05                    CORY L. CARLYLE
Do Not Publish                 JUSTICE
Tex. R. App. P. 47.2(b)



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ADRIAN ALEXANDREW CASTILLEJA, Appellant

No. 05-20-00866-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 1, Dallas County, Texas Trial Court Cause No. F17-76547-H. Opinion delivered by Justice Carlyle. Justices Myers and Goldstein participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 6th day of July, 2022.